THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 3:20-cr-00003-TCB-RGV |
| | : | |
| MONTAVIS DIXON | : | |

## MAGISTRATE JUDGE'S FINAL
## REPORT, RECOMMENDATION, AND ORDER

Defendant Montavis Dixon ("Dixon") is charged in a three-count indictment

with production, receipt, and possession of child pornography in violation of 18

U.S.C. §§ 2251(a), (e), and 2252(a)(2), (a)(4)(b), (b), (b)(2). [Doc. 1].[1] Dixon has filed

a motion to suppress evidence, [Doc. 36], a motion to suppress statements, [Doc.

37], a motion for return of property, [Doc. 38], and an amended motion for return

of property, [Doc. 41]. The government opposes Dixon's motions for return of

property, [Doc. 45], and Dixon has filed a reply in support of these motions, [Doc.

48]. Following an evidentiary hearing on Dixon's motion to suppress statements

held on December 10, 2020, [Doc. 50],[2] the parties filed briefs regarding the

---

[1] The listed document and page numbers in citations to the record refer to the
document and page numbers shown on the Adobe file reader linked to the Court's
electronic filing database, CM/ECF.

[2] See [Doc. 55] for the transcript of the evidentiary hearing, which will be referred
to hereinafter as "(Tr. at ___)." The government submitted an exhibit at the

remaining motions, [Docs. 58, 59, 63, & 64.  Additionally, the government has filed a motion for leave to file a sur-reply to respond to new arguments raised by Dixon in his reply in support of his motion to suppress evidence.  [Doc. 65]; see also [Doc. 66].  For the reasons that follow, the government's motion for leave to file a sur-reply, [Doc. 65], is **GRANTED**,[3] and it is **RECOMMENDED** that each of Dixon's motions, [Docs. 36, 37, 38, & 41], be **DENIED**.

---

hearing, which will be referred to as "(Gov. Ex. 1)," and Dixon also submitted an exhibit at the hearing, which will be referred to as "(Dixon Ex. 1)."

[3] Although "[n]either the Federal Rules nor the Court's Local Rules allow sur-reply briefs as a matter of right, and the Court normally does not permit sur-replies," USMoney Source, Inc. v. Am. Int'l Specialty Lines Ins. Co., No. 1:07-cv-0682-WSD, 2008 WL 160709, at *2 n.5 (N.D. Ga. Jan. 15, 2008), rev'd on other grounds, 288 F. App'x 558 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted), "the Court may in its discretion permit the filing of a surreply . . . where a valid reason for such additional briefing exists, such as where the movant raises new arguments in [his] reply brief," Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005 ) (citations omitted).  The government seeks leave to file a sur-reply to address two arguments raised by Dixon for the first time in his reply brief.  See [Doc. 65]; see also [Doc. 64].  Dixon has not opposed the government's motion for leave to file a sur-reply. Accordingly, the government's motion, [Doc. 65], is **GRANTED**, and the Court will consider the government's sur-reply brief, [Doc. 66], in ruling on Dixon's motion to suppress evidence, [Doc. 36].

# I. FACTUAL BACKGROUND

On April 14, 2017, the Honorable Catherine M. Salinas, United States Magistrate Judge ("Judge Salinas"), issued a search warrant, authorizing the search of a house located at 1521 N. Hill Street, Griffin, Georgia (the "property"), and the seizure of items described in Attachment B to the warrant, [Doc. 58-1 at 2], including, among other things, "cellular telephones or other video display and storage devices that can access, record, store, and/or display images or video of child pornography or child erotica or information pertaining to an interest in child pornography or sexual activity with minors," [id. at 4].  The warrant required that it be executed on or before April 27, 2017, "not to exceed 14 days" from the date the warrant was issued.  [Id. at 2].

Judge Salinas issued the warrant pursuant to the application and affidavit of Federal Bureau of Investigation ("FBI") Special Agent Kelly Jo Strickler ("SA Strickler"), [id. at 6-25], who averred that she had "probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of [18 U.S.C. §] 2251(d) (advertising and seeking production of child pornography) exist[ed] in computers and storage devices located in [the property]," [id. at 7 ¶ 2].  Specifically, she attested that on "March 24, 2017, the administrator of a website called BlackSexFinder.com [] contacted the FBI to report

that a user of the website was asking other users to send videos of themselves having sex with children" under the username "Makaylaa," and that Makaylaa offered various users of the website between $10,000 and $50,000 to produce the videos. [Id. at 9-10 ¶ 7 (internal marks omitted)]. The affidavit specified that in at least one of these messages, Makaylaa stated that the money would be sent via Western Union, [id. at 10 ¶ 9], but Makaylaa had "asked eight separate users to make a video of themselves having sex with a 'little girl,'" and the method of payment was not clarified for each of these requests, [id. at 9-10 ¶¶ 7-10]. SA Strickler added that surveillance of the property revealed the presence of a minor child who appeared to be under the age of 12, and that the "cooperating administrator of BlackSexFinder.com provided the FBI with Makaylaa's Internet Protocol (IP) address used to access the [] website," which was later determined to be serviced by AT&T, and pursuant to an administrative subpoena for information pertaining to the IP address, AT&T responded that the IP address was assigned to Dixon at the property. [Id. at 11 ¶¶ 11-12 (internal marks omitted)].

On the morning of April 18, 2017, SA Strickler, along with approximately nine FBI agents and task force officers, one victim specialist, and local law

enforcement officers, who arrived at the residence in marked police cars,[4] executed the search warrant.  (Tr. at 4-5, 9-10, 12); see also [Doc. 36-2 at 2].  The agents encountered four adults and three children inside the residence,[5] and Dixon agreed to be interviewed about five to ten minutes after the agents arrived.  (Tr. at 5).[6]  The interview was conducted by SA Strickler and Task Force Officer Lori Nicholson ("TFO Nicholson") at a table in the front yard of the property.  (Tr. at 5-6); see also (Tr. at 11; Dixon Ex. 1 at 1).  SA Strickler testified that she was armed with a firearm during the interview, but that it was hidden under her shirt and

---

[4] SA Strickler testified that she could not recall how many police cars were parked there, but that it was not likely more than two.  (Tr. at 11-12).  The police cars, which were parked along the perimeter of the property, were marked with insignia and their lights were operating throughout the execution of the search. (Tr. at 12).

[5] Upon viewing the condition of the home, including that there was no running water, there were "a lot of pests," including cockroaches, as well as trash "everywhere," and the roof was unstable, the victim specialist contacted the Division of Family and Children Services, and the children were subsequently removed from the home.  (Tr. at 13-14).

[6] The interview began at 6:49 a.m.  (Gov. Ex. 1 at 0:01-0:09).

was never drawn,[7] and that she was not sure whether TFO Nicholson was carrying a firearm, but she did not see one at the time.  (Tr. at 7, 12).

At the outset of the interview, the agents identified themselves and informed Dixon that he was not under arrest and that he did not have to answer any of their questions, and that they wanted to speak to him to help him understand why they were there, as well as to help them understand what happened, explaining that they had received reports of a crime that occurred over the internet.  (Tr. at 6; Gov. Ex. 1 at 0:17-0:55).  They began by asking Dixon about the utilities for the property, including who paid for the internet, which internet provider they used,[8] the password for the wireless internet, who used the internet, and which websites he visited; whether he or anyone else in the house had computers or cell phones; and how long he had lived at the property.  (Tr. at 8; Gov. Ex. 1 at 0:56-1:45, 2:29-11:49).  The agents subsequently directed the conversation to the communications with users of BlackSexFinder.com requesting

---

[7] When SA Strickler arrived at the property, she was wearing a vest identifying herself as a law enforcement officer, but she removed it after completing the initial entry of the home.  (Tr. at 12-13).

[8] Dixon identified AT&T as the internet provider.  (Gov. Ex 1 at 7:09-7:18).

they send videos of themselves having sex with children.  <u>See</u> (Tr. at 8; Gov. Ex. 1 at 11:50-14:04).

At one point in the interview, SA Strickler asked Dixon for the passcode to his cellphone,[9] which was sitting on the table between them.  (Tr. at 8, 17-18; Gov. Ex. 1 at 14:05-14:17).  SA Strickler testified that "initially[, ] Dixon seemed to want to tell [them] the passcode[.]"  (Tr. at 8); <u>see also</u> (Tr. at 18).  The agents told Dixon that he could input the passcode himself.  (Gov. Ex. 1 at 14:14-14:17).  Dixon picked up the iPhone to enter the passcode and SA Strickler asked whether they could look at it, but he said that he first needed to log off his social media accounts.  (Gov. Ex. 1 at 14:20-14:26).  Dixon began to express concern about the agents looking through his phone, explaining that it had personal information, and SA Strickler responded that he did not have to let them look at his phone, but they would need to take it from him because it was part of the search warrant.  (Gov. Ex. 1 at 14:26-14:43).  SA Strickler stated that it was "up to [him]," and Dixon responded that he would let them look through it, but first he had to "do some stuff."  (Gov. Ex. 1 at 14:44-14:56); <u>see also</u> (Tr. at 8).  Out of concern that Dixon "would attempt to alter the contents of the phone," TFO Nicholson took the phone from Dixon's hands

---

[9] Dixon's cellphone is an iPhone 6s with serial number f4JQH5SEGRYK (the "iPhone" or the "phone").  <u>See</u> [Doc. 38 at 1; Doc. 41 at 1; Doc. 44 at 1].

and the agents told him he could not alter anything on the phone because of the search warrant and that they needed to take it.  (Tr. at 8, 17; Gov. Ex. 1 at 14:56-15:28).  Dixon stated that he wanted to keep his phone since he was paying for it, and SA Strickler explained that if he let them look through it, there was a chance he could keep it, but otherwise they would need to take the phone, and she again told him that the choice was his.  (Gov. Ex. 1 at 15:29-15:52).  Dixon asked how long they would need to keep it, and SA Strickler stated that it "partly depend[ed] on how hard it [would be] to get into the phone," and that "with no passcode, it could take a couple days, it could take a week, [or] it could take longer."  (Gov. Ex. 1 at 15:53-16:20).  Toward the end of the interview, the agents again asked whether Dixon would be willing to provide his passcode, and SA Strickler explained that he could input the passcode himself and they could then change the settings to no longer require a passcode to access the phone so they would not need to know his passcode, but Dixon ultimately decided not to give the agents his passcode.  (Tr. at 8, 18; Gov. Ex. 1 at 37:50-44:13).[10]

Dixon informed the agents that he needed to go to school that morning as he was pursuing his General Educational Development ("GED") diploma, and at

---

[10] SA Strickler described Dixon as "coherent," and stated that he did not appear to be under the influence of drugs or alcohol.  (Tr. at 6).

the conclusion of the interview, they said he could stand outside the house with his family and wait for his ride to school, but he and his family could not go back in the house while the search was ongoing. (Tr. at 9; Gov. Ex. 1 at 2:13-2:27, 44:18-42). The interview lasted approximately 45 minutes. See (Gov. Ex. 1). Dixon was not restrained at any point during the interview, (Tr. at 7), nor was he arrested that day, (Tr. at 6, 9), and the agents did not provide Dixon with the Miranda[11] warnings during this interview, (Tr. at 6). During the search, multiple items were seized from the property, including the iPhone. [Doc. 36-2 at 2-3].[12] SA Strickler testified that she did not discover any Western Union or PayPal records during the search. (Tr. at 14).

On the day of the search, SA Strickler gave Dixon her card and her cellphone number. (Tr. at 15). Dixon subsequently called SA Strickler numerous times to ask for the return of the phone, and she informed him that she could not return it until the search was concluded, but advised him that the search would go much

---

[11] See Miranda v. Arizona, 384 U.S. 436 (1966).

[12] On April 26, 2017, SA Strickler returned some of the seized items to Dixon's mother. (Tr. at 14); [Doc. 36-3 at 2].

faster if he provided his passcode to the phone.  (Tr. at 15-16).  SA Strickler did not record any of these conversations.  (Tr. at 16).[13]

On April 25, 2019, a forensic examination was performed on the iPhone and all derivative evidence was placed on a DVD disk.  [Doc. 36-4 at 2-3].  A federal grand jury in the Northern District of Georgia returned a three-count indictment against Dixon on February 25, 2020, charging him with the unlawful production, receipt, and possession of child pornography.  [Doc. 1].  The indictment also contained a forfeiture provision pursuant to 18 U.S.C. § 2253.  [Id. at 2-3].  On October 8, 2020, the government filed a Bill of Particulars, identifying the iPhone as property subject to forfeiture pursuant to the forfeiture provision of the indictment.  [Doc. 44].  Dixon has filed several pretrial motions, including a motion to suppress his statements to the agents, [Doc. 37], a motion to suppress evidence from the search of the iPhone, [Doc. 36], and a motion and an amended motion for return of property seeking the return of the iPhone to his possession, [Docs. 38 & 41].  Each of these motions have been fully briefed, [Docs. 45, 48, 58, 59, 63, 64, 66], and are now ripe for ruling.

---

[13] After being inundated with calls from Dixon, including at one point having "over 40 missed calls" from him, SA Strickler blocked his phone number.  (Tr. at 16).

## II.  DISCUSSION

**A.**     **Motion to Suppress Evidence, [Doc. 36]**

Dixon moves to suppress "any evidence recovered by law enforcement in the unlawful seizure and search of [the] iPhone," arguing that "[a]lthough a search warrant had been issued . . . for the search of [his] home, including of computer equipment and phones, that warrant only allowed a search of the information contained within the iPhone between April 14 and 27, 2017," and thus, the warrant had "expired and was void when the 2019 search took place." [Doc. 36 at 1, 4 (citation omitted)]. In response, the government argues that the iPhone was seized and searched pursuant to a valid and timely executed warrant, as the property was searched and the iPhone was seized within the timeframe imposed by the warrant, and because the government was not required to search the contents of the iPhone within that timeframe as well, the subsequent search did not violate the warrant or Federal Rule of Criminal Procedure 41(e). [Doc. 58 at 2-6]. Additionally, the government contends that even if "the warrant was not timely executed, suppression is unwarranted," as "there is no evidence that the FBI agents acted recklessly or in a grossly negligent manner," but rather they "searched the [iPhone] under the belief that they had a valid search warrant that

11

allowed the search" and thus, "acted in an objectively reasonable manner." [Id. at 6].

In reply, Dixon argues that while Rule 41(e) does not "state a fixed upper limit or deadline as to when the government must review seized electronic data," it does not have "*carte blanche* to delay searches of seized items indefinitely," and the 737-day delay from the date of seizure was unreasonable under the Fourth Amendment, which "requires the government to execute the warrant by completing its review of seized items within a 'reasonable' period of time." [Doc. 64 at 2-3 (citations omitted)]. Dixon also argues that "probable cause had [been] extinguished before the search of [his] phone." [Id. at 6]. Specifically, he contends that the probable cause affidavit relied on suspicions that "he was paying (or intended to pay) individuals to create videos of the sexual abuse of a child . . . based upon online chats they had received and the investigation tying those chats to [] Dixon's residence," and the "affidavit also described that [surveillance revealed] Dixon had at least one younger sibling in the house, suggesting that he or she might have been sexually abused," but upon executing the warrant, "agents were able to conclude that [] Dixon was living in poverty . . . with [three] other adults and [three] children in a small, bug-infested house that had no running water and a damaged and leaking roof"; they "did not find any evidence to

suggest that [] Dixon had Western Union or Pay[P]al records"; and "[w]itihin a few days, a forensic interview was conducted of [] Dixon's three younger siblings, but there was no evidence that they had been sexually abused."  [Id. at 7 (citations omitted)].  Because these arguments were raised for the first time in Dixon's reply brief, see [Docs. 36 & 64], the government filed a sur-reply to address them, [Doc. 66]; see also [Doc. 65].  First, the government argues that the delay in extracting data from the iPhone was reasonable due to the difficulties created by its encryption, as Dixon refused to provide the passcode.  [Doc. 66 at 2-4].  The government also argues that the facts learned by the agents during and after the search of the property did "not negate the probable cause that he committed the crime of advertising visual depictions of minors engaging in sexually explicit conduct," as the "conduct criminalized is the advertising – not the final purchase of a visual depiction of a minor engaging in sexually explicit conduct," and that in any event, "[t]here is no requirement that a law enforcement officer wait to seize and search items pursuant to a valid search warrant until they have updated the issuing Magistrate Judge with facts learned during the execution of the search warrant."  [Id. at 4-6].

Rule 41(e) of the Federal Rules of Criminal Procedure requires that a warrant to search for and seize property must command the officer to "execute the

warrant within a specified time no longer than 14 days[.]"  Fed. R. Crim. P.

41(e)(2)(A)(i).  The rule also provides that a warrant "may authorize the seizure of

electronic storage media or the seizure or copying of electronically stored

information," and that "[u]nless otherwise specified, the warrant authorizes a later

review of the media or information consistent with the warrant," as "[t]he time for

executing the warrant in Rule 41(e)(2)(A) . . . refers to the seizure or on-site copying

of the media or information, and not to any later off-site copying or review."  Fed.

R. Crim. P. 41(e)(2)(B).  Thus, "[t]his rule acknowledges the need for a two-step

process: officers may seize or copy the entire storage medium and review it later

to determine what electronically stored information falls within the scope of the

warrant," as a "substantial amount of time can be involved in the forensic imaging

and review of information" due to "the sheer size of the storage capacity of media,

difficulties created by encryption and booby traps, and the workload of the

computer labs."  Fed. R. Crim. P. 41(e)(2), advisory committee note to 2009

amendment.

The search warrant in this case was issued on April 14, 2017, and required

that it be executed by April 27, 2017, "not to exceed 14 days" from the date it was

issued.  [Doc. 58-1 at 2].  The warrant authorized the seizure of cellular phones,

among other items, but did not include any additional language imposing a

deadline for review of electronically stored information.  [Id. at 2, 4-5].  Agents executed the warrant on April 18, 2017, within the timeframe set by the warrant, and seized several items, including the iPhone.  (Tr. at 4, 9-10); [Doc. 36-2 at 2].  The iPhone was protected by a passcode, which Dixon declined to reveal.  (Tr. at 8, 16, 18; Gov. Ex. 1 at 14:05-16:20, 37:50-44:13).  Due to its encryption, the iPhone was not searched until April 25, 2019.  See [Doc. 36-4 at 2-3].

In his motion to suppress, Dixon initially argued that the iPhone was unlawfully searched without a warrant because the search warrant required that it be executed by April 27, 2017, but the iPhone was not searched until April 25, 2019.  See [Doc. 36].  "The problem with [Dixon's] argument, however, is its premise: that his phone was not 'searched' for Fourth Amendment purposes until the FBI completed its forensic analysis of the phone in [April] of [2019]."  United States v. Carrington, 700 F. App'x 224, 232 (4th Cir. 2017) (unpublished).  As the government correctly argues, see [Doc. 58 at 2-6], Rule 41(e) expressly authorizes the later review of electronically stored information contained within an item seized during the 14-day time period, as the time for executing the warrant refers only "to the seizure or on-site copying of the media or information, and not to any later off-site copying or review," Fed. R. Crim. 41(e)(2)(A)-(B).  "In other words, an initial seizure of [Dixon's] phone after the 14-day expiration period would have

contravened the terms of the warrant—but that is not what happened here, where the phone already was in government custody pursuant to a lawful seizure," and "the fact that the government did not [conduct its forensic analysis of the iPhone] until after the warrant's expiration date is consistent with the warrant itself." Carrington, 700 F. App'x at 232 (citations omitted); see also United States v. Ilonzo, Criminal File No. 1:12-CR-276-SCJ-GGB, 2015 WL 5827598, at *3-4 (N.D. Ga. Oct. 6, 2015) (rejecting defendants' argument that the government's failure to search the computers within the 14-day timeframe imposed by the search warrant rendered the search invalid where the computers were seized within the 14 days and the warrant "did not 'otherwise specify' when the data had to be copied or reviewed" because "[u]nder Rule 41, off-site review or copying need not be completed by the deadline for execution").

In his reply, Dixon argues that while Rule 41(e) permits the later review of electronically stored information, the government must still review that information within a reasonable time in order to comply with the requirements of the Fourth Amendment, and that the delay in this case was unreasonable, thereby requiring suppression of the evidence uncovered during the April 25, 2019, search. [Doc. 64 at 3-6].  For support, Dixon relies on United States v. Metter, 860 F. Supp. 2d 205 (E.D.N.Y. 2012), [Doc. 64 at 5-6], in which the court determined that "the

government's more than fifteen-month delay in reviewing the seized electronic evidence, under the facts and circumstances of th[e] case, constitute[d] an unreasonable seizure under the Fourth Amendment," Metter, 860 F. Supp. 2d at 212. The warrants in that case authorized the seizure of computer hard drives and email accounts, as well as the off-site imaging of information contained therein, id. at 214 (citations omitted), and after seizing "four computer hard drives from [the defendant's] home, and a snapshot of all of the activity that had occurred in [his] personal email account," the government "promptly imaged the hard drives and returned them," but the court determined that the "point at which the government faltered [was] its delay in reviewing the imaged evidence to determine whether the evidence that the government seized and imaged fell within the scope of the categories of information sought in the search warrants," id. at 214-15 (footnotes omitted). While recognizing "that under current law there is no established upper limit as to when the government must review seized electronic data to determine whether the evidence seized falls within the scope of a warrant," the court found no authority "indicating that the government may seize and image electronic data and then retain that data with no plans whatsoever to *begin* review of that data to determine whether any irrelevant, personal information was improperly seized,"

and thus, the "government's blatant disregard for its responsibility . . . [was] unacceptable and unreasonable." Id. at 215 (citations omitted).

The government points out, however, that Metter did not "involve a delay caused by encryption difficulties," as in this case. [Doc. 66 at 2]. Rather, "the government was able to access the data from the computers and had the ability to review them for the entire 15-month period." [Id. at 2-3]. By contrast, here "the period of delay was the time it took to access the phone due to difficulties caused by encryption and the data was reviewed once encryption technology successfully unlocked the cell phone." [Id. at 3]. Therefore, given the iPhone's encryption, its contents "could not have been quickly reviewed and required prolonged offsite analysis." United States v. Harmon, Case No. 3:18-cr-221-SI, 2018 WL 5786217, at *2 (D. Or. Nov. 5, 2018) (citation omitted).

"The reasonableness of the delay is determined in light of all the facts and circumstances, and on a case-by-case basis." United States v. Mitchell, 565 F.3d 1347, 1351 (11th Cir. 2009) (per curiam) (citation and internal marks omitted). "Here, the [g]overnment explains that its delay in reviewing the [electronically stored information] contained in [the iPhone was] the result of difficulties created by the encryption," and "the basis offered for the delay . . . has been credited by the advisory committee," United States v. Estime, 19-cr-711 (NSR), 2020 WL

18

6075554, at *15 (S.D.N.Y. Oct. 14, 2020) (citations omitted); see also [Doc. 66 at 2-4], as the advisory committee notes for Rule 41(e) expressly acknowledge that a "substantial amount of time can be involved in the forensic imaging and review of information" due to "difficulties created by encryption," Fed. R. Crim. P. 41(e)(2), advisory committee note to 2009 amendment.  "It [was Dixon's] own encryption that ha[d] . . . prevented the FBI from more timely searching the [iPhone ], and there [was ] no unreasonable delay on the part of the FBI."  Harmon, 2018 WL 5786217, at *3 (citation omitted); see also id. at *2 n.1 (finding the defendant's "repeated assertion that searching a computer" could be done quickly was "inaccurate, especially when a  computer has been locked and encrypted," and that these assertions were "not consistent with the realities of the time it takes to break encryption and recover hidden or deleted files").

Accordingly, although the government's 24-month delay in searching the iPhone was "certainly lengthy," it "does not furnish a basis to suppress evidence obtained from [the iPhone]."  Estime, 2020 WL 6075554, at *14-15 (finding the government's ongoing delay in reviewing the electronically stored information in defendant's cellphone was not unreasonable even though 10 months had already passed and the government was still working on accessing the information due to the difficulties created by encryption); see also United States v. Morgan, 443 F.

Supp. 3d 405, 406, 410 (W.D.N.Y. 2020) (concluding that there was "still plenty of time for the government to access the iPhone's contents" where the trial was not scheduled to commence until the following year, even though the iPhone was seized in May 2018 and the government to date "ha[d] been unsuccessful . . . in accessing the contents of the iPhone," which was protected by a passcode); United States v. Pinto-Thomaz, 352 F. Supp. 3d 287, 312-13 (S.D.N.Y. 2018) (footnote omitted) (finding, "contrary to [defendant's] arguments, the [g]overnment ha[d] not exceeded any constitutional or Rule 41 deadline for concluding its search of the iPhone given the difficulties posed by encryption" where the government was still unable to break the encryption after several months because the "phone [was] locked and passcode-protected" and defendant had "refused to provide the passcode").

Dixon also argues in his reply brief that the probable cause relied on to obtain the search warrant had been extinguished after the search of the property and thus could not support the search of his phone, [Doc. 64 at 6-11], asserting that "[h]ad the government applied for a search warrant in 2019 prior to the search of the phone and included in the probable cause affidavit the additional, material facts learned in their investigation of the 'Makaylaa' matter following the issuance of the 2017 warrant," including the agents' "observations of [] Dixon's abject

poverty and inability to carry out the suspected scheme, the absence of Western Union or Pay[P]al records, and the absence of evidence of sexual abuse of his siblings," a "neutral magistrate would not have found probable cause to issue a warrant," [id. at 9]. The Court finds these arguments unavailing.

Dixon does not dispute that SA Strickler had probable cause at the time she sought and obtained the search warrant in 2017. See [Docs. 36 & 64]. Indeed, SA Strickler's affidavit in support of her application for the warrant provided "probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of [18 U.S.C. §] 2251(d) (advertising and seeking production of child pornography) exist[ed] in computers and storage devices located in [the property]" because of reports that an individual operating an account with the username, Makaylaa, who was using an IP address serviced by AT&T and registered with Dixon at the property, had been messaging users of BlackSexFinder.com with requests that they send videos of themselves having sex with children, and offering compensation for those videos, with the individual specifically offering to send the money via Western Union to at least one user. [Doc. 58-1 at 7 ¶ 2, 9-11 ¶¶ 7-11]. While Dixon relies on SA Strickler's testimony at the evidentiary hearing that records from Western Union and PayPal were not discovered during the search and that the property was observed to be run down,

21

indicating that Dixon was living in poverty, to argue that "he had no ability to wire anyone thousands of dollars in advance to pay for them to abuse a child," [Doc. 64 at 7-8 (citations omitted)]; see also (Tr. at 13-14), as the government correctly responds, [Doc. 66 at 5-6], Dixon was suspected of violating 18 U.S.C. § 2251(d), which prohibits individuals from making, printing, or publishing "any notice or advertisement seeking" the production of child pornography.  The "conduct criminalized is the advertising – not the final purchase of a visual depiction of a minor engaging in sexually explicit conduct," [Doc. 66 at 6], and thus, even to the extent that the information learned at the time of the 2017 search could conclusively show that Dixon could not afford to fulfill his offers to pay for the videos he requested, this would not negate the probable cause identified in SA Strickler's affidavit that Dixon had sent multiple requests to individuals for child pornography.  Moreover, while SA Strickler's affidavit noted that surveillance of the property revealed the presence of a minor child, there was no allegation that Dixon or anyone else on the property had sexually abused the child, see [Doc. 58-1 at 7-19], and therefore, the absence of evidence that Dixon's minor siblings had

been recently sexually abused certainly would not negate the probable cause identified.[14]

Alternatively, the government argues that even if the 2017 search warrant in this case could not support the 2019 search of the iPhone, suppression of the evidence would not be required because the agents reasonably relied in good faith on the validity of the warrant, and there is no evidence they acted recklessly or in a grossly negligent manner.  [Doc. 58 at 6].  Indeed, "[e]xclusion of evidence is an 'extreme sanction' to be used only as a 'last resort,'" and to "'trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'"  United States v. Brooks, 648 F. App'x 791, 794 (11th Cir. 2016) (per curiam) (unpublished) (quoting Herring v. United States, 555 U.S. 135, 140, 144 (2009)).  As previously discussed, the warrant did not set forth any additional requirements for the review of electronically stored information contained within property seized pursuant to the warrant, see [Doc. 58-1 at 2]; see

---

[14] Although Dixon cites SA Strickler's evidentiary hearing testimony to show that a forensic interview of Dixon's siblings revealed no sexual abuse, [Doc. 64 at 7 (citing (Tr. at 13))], SA Strickler merely testified that a forensic interview was conducted and that the children were removed from the property due to the state of the house, but she did not state whether there was any evidence of sexual abuse uncovered in the forensic interview, see (Tr. at 13-14).

also Fed. R. Crim. P. 41(e)(2)(B) ("Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."), and the agents searched the iPhone, once they were finally able to access it, under the reasonable belief that a valid warrant permitted the search. Given the iPhone's encryption and Dixon's refusal to provide the passcode, the "government acted with reasonable diligence in conducting its forensic examination," and thus, even if the government's delay "constituted some Fourth Amendment violation—which [the Court] reject[s]—the facts of this case do not rise to the level necessary to justify the 'extreme sanction' of exclusion." Brooks, 648 F. App'x at 794. Accordingly, Dixon has not identified any legitimate basis for suppression, and it is **RECOMMENDED** that his motion to suppress evidence, [Doc. 36], be **DENIED**.

## B. Motions for Return of Property, [Docs. 38 & 41]

Pursuant to Federal Rule of Criminal Procedure 41(g), Dixon moves for the return of the iPhone or, in the alternative, "for a hearing requiring the government to show cause with particularity why it has an interest in the property it has seized and why the property should not be returned to its rightful owner," as the "seizure and search of the iPhone [were] unlawful." [Doc. 38 at 1-2]. In his amended motion, Dixon asserts that "[t]o the extent that the phone might contain

contraband images that [he] could not possess, media contained on the phone can be wiped or erased" before it is returned.  [Doc. 41 at 3].  The government responds that Dixon's Rule 41(g) motion is not properly before the Court because "criminal forfeiture has been initiated and the proceedings are ongoing," and when "the contents of the iPhone were searched, agents found contraband images and communications stored on the phone" and thus, "the iPhone is evidence . . . subject to forfeiture[.]"  [Doc. 45 at 4-5].

Rule 41(g) of the Federal Rules of Criminal Procedure provides that a "person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return" by filing a motion in the district where the property was seized, and that the Court "must receive evidence on any factual issue necessary to decide the motion."  Fed. R. Crim. P. 41(g).[15]  In granting a motion under Rule 41(g), the Court "may impose reasonable conditions to protect access to the property and its use in later proceedings."  Id.  "'If a motion for return of property is made while a criminal prosecution is pending, the burden is on the movant to show that he . . . is entitled to the

---

[15] "In 2002, Rule 41(e) was reclassified as Rule 41(g) without substantive changes." United States v. Ali, 306 F.R.D. 694, 695 n.2 (N.D. Ala. 2015); see also De Almeida v. United States, 459 F.3d 377, 380 n.2 (2d Cir. 2006) (citation omitted) ("[C]ourts have applied the case law concerning former Rule 41(e) to the current Rule 41(g).")

property." United States v. Marabini, No. 06-80021-CR, 2006 WL 3921906, at *6 (S.D. Fla. Dec. 28, 2006), adopted by 2007 WL 128820, at *1 (S.D. Fla. Jan. 12, 2007) (quoting United States v. Chambers, 192 F.3d 374, 377 (3d Cir. 1999)); see also United States v. Oduu, 564 F. App'x 127, 130 (5th Cir. 2014) (per curiam) (unpublished).  However, "a Rule 41(g) motion is properly denied if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture, or the government's need for the property as evidence continues." United States v. Garcon, 406 F. App'x 366, 369 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted); see also United States v. McCray, CRIMINAL ACTION FILE NO. 1:15-cr-212-WSD/AJB, 2017 WL 9472888, at *14 n.17 (N.D. Ga. June 15, 2017), adopted by 2017 WL 3141172, at *14 (N.D. Ga. July 25, 2017) (citations and internal marks omitted) ("To prevail on [a motion for return of property], a criminal defendant must demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended.").[16]

_____

[16] The Seventh Circuit has explained the proper timing for bringing a Rule 41(g) motion as follows:

> The proper office of a Rule 41(g)[] motion is, before any forfeiture proceedings have been initiated, or before any criminal charges have

26

Dixon argues that the seizure and search of the iPhone were unlawful and thus, he is entitled to its return, [Doc. 38 at 2; Doc. 41 at 2], and he asserts that to "the extent that the phone might contain contraband images that [he] could not possess, media contained on the phone can be wiped or erased" prior "to the return of the phone and can be confirmed by the parties and the Court," and thus, the "existence of contraband media, which can be removed and destroyed, does not justify denial of [his] motion," [Doc. 41 at 3].  However, Dixon's arguments fail for the following reasons.

First, as previously discussed with respect to Dixon's motion to suppress evidence, the iPhone was lawfully seized and searched pursuant to the search warrant issued by Judge Salinas.  Additionally, the government explains that "[w]hen the contents of the iPhone were searched, agents found contraband images and communications stored on the phone," and therefore, "the iPhone is evidence[.]"  [Doc. 45 at 5].  Accordingly, because Dixon has not shown that "the

---

been filed, to seek the return of property seized without probable cause, or property held an unreasonable length of time without the institution of proceedings that would justify the seizure and retention of the property. The rule can also be invoked after criminal proceedings have concluded to recover the defendant's property when the property is no longer needed as evidence—unless, of course, it has been forfeited in the course of those proceedings.

United States v. Sims, 376 F.3d 705, 708 (7th Cir. 2004) (citation omitted).

seizure was illegal or the government's need for the property as evidence has ended," his motion is due to be denied.  McCray, 2017 WL 9472888, at *14 n.17 (citations and internal marks omitted); see also United States v. Popham, 382 F. Supp. 2d 942, 956 (E.D. Mich. 2005), aff'd, 250 F. App'x 170 (6th Cir. 2007) (unpublished) (citation and internal marks omitted) ("When the government has a continuing interest in the property, the property does not have to be returned.").

Moreover, the iPhone has been identified in the Bill of Particulars filed by the government as being subject to the forfeiture provision of the indictment. [Doc. 1 at 2-3; Doc. 44 at 1]; see also United States v. Chicago, CRIMINAL NO. 15-00168-CG, 2017 WL 2963475, at *3 (S.D. Ala. July 11, 2017) (emphasis, citations, and internal marks omitted) (explaining that "the indictment . . . need only provide general notice that the government is seeking forfeiture, without identifying the specific property being sought" and "if a question of notice arises, a bill of particulars that lists specific property can provide a criminal defendant all the notice he . . . is due").  Accordingly, Dixon "is entitled to challenge the forfeiture on the merits during the forfeiture phase of his criminal trial," Panos v. United States, Civil Action No. 13-242, 2014 WL 317784, at *3 (W.D. La. Jan. 27, 2014) (footnote omitted), but he "is not entitled to a post-restraint, pretrial hearing on the issue of probable cause where a grand jury has determined that specific

28

property is subject to forfeiture," United States v. Travers, CASE NO. 96-477-CR-UNGARO-BENAGES(s)(s), 1997 WL 35430441, at *2 (S.D. Fla. Apr. 8, 1997) (citation omitted). Accordingly, Dixon's motion is due to be denied because the property is subject to criminal forfeiture.[17] See United States v. Guba, No. 1:09-CR-17-SPM/AK, 2009 WL 2606454, at *1–2 (N.D. Fla. Aug. 18, 2009) (denying the Rule 41(g) motion where property was subject to forfeiture allegations of indictment); see also United States v. Hills, Case No. 1:16CR329, 2018 WL 1621088, at *8 (N.D. Ohio Apr. 4, 2018) (citation omitted) (holding that defendant's remedy when seeking return of seized property subject to forfeiture allegations in an indictment "lies in contesting forfeiture at the conclusion of the criminal proceedings"). Therefore, it is **RECOMMENDED** that Dixon's motion and amended motion for return of property, [Docs. 38 & 41], be **DENIED**.

---

[17] Furthermore, the conditions of Dixon's release prohibit him from "possess[ing], access[ing], or us[ing] any electronic device capable of accessing the internet," including "cellular telephones," "regardless of whether the device is actually connected to the internet." [Doc. 14 at 3]; see also Harmon, 2018 WL 5786217, at *3 (second alteration in original) (finding that the defendant had not suffered unfair prejudice from the government's continued retention of a computer where the conditions of his release "prohibit[ed] him from directly or indirectly using or possessing 'a computer or electronic media, including any devices and cellular phones, with internet access capabilities or access[ing] a computer or electronic media, without prior approval of Pretrial Services'").

C.   **Motion to Suppress Statements, [Doc. 37]**

Dixon moves to suppress statements he made to law enforcement agents,[18] arguing that his statements were made involuntarily and without a knowing waiver of his Miranda rights, in violation of the Fifth Amendment.  [Doc. 37].  The government argues that Dixon's motion should be denied because he was not in custody at the time of the interview on April 18, 2017, which took place outside his home, and thus the statements were not made in violation of Miranda, and because Dixon's statements during the interview were voluntary and made free of any threats, promises, or coercion from law enforcement.  See [Doc. 59].  The Court will address each of Dixon's claims in turn, beginning with whether his statements were taken in violation of Miranda.  See United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam) (citation omitted) ("[The Court] first decide[s] whether law enforcement officers complied with the requirements of *Miranda*[ and] if so, [it] then determine[s] if the confession was voluntary.").

---

[18] Dixon originally moved to suppress "all statements to law enforcement officers," including the statements made during the interview on April 18, 2017, and statements made during his subsequent phone conversations with SA Strickler. See [Doc. 37].  At the evidentiary hearing, the government clarified that it does not intend to offer evidence from the subsequent conversations and will only seek to admit into evidence the recorded interview, (Tr. at 22-23), and the government re-affirmed this position in its response to Dixon's motion to suppress, [Doc. 59 at 5 n.2].   Accordingly, the Court will confine the analysis of Dixon's motion to suppress to the statements he made during the April 18, 2017, interview.

1.    **_Miranda_ Violation Claim**

The ruling in Miranda requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation.   See Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994). Interrogation for Miranda purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).   "The Supreme Court in _Miranda_ established that custodial interrogation cannot occur before a suspect is warned of [his] rights against self-incrimination," but "[p]re-custodial questioning . . . does not require _Miranda_ warnings."  United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (per curiam) (unpublished) (first alteration in original) (citations and internal marks omitted).   "Statements made in violation of _Miranda_ are not admissible at trial."  United States v. Barry, 479 F. App'x 297, 299 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted).

The parties' post-hearing briefs dispute whether Dixon was subjected to a custodial interrogation on April 18, 2017, and, therefore, whether Miranda warnings were required.  See [Doc. 59 at 5-12; Doc. 63 at 3-4].  The government

argues that Dixon was not in custody at the time of the interview because the totality of the circumstances show there was "no restraint on freedom of movement of the degree associated with a formal arrest," including that:

> (1) the interview took place outside of [his] home, (2) [he] was told that he was not under arrest and that he did not have to answer any of the agents' questions, (3) [he] was not restrained during the interview, (4) the agents did not raise their voices, yell, or threaten [him], (5) neither agents' firearm was visible during the interview, (6) neither agent used physical force on [him], (7) [he] appeared calm in the interview, (8) the interview lasted approximately forty minutes, and (9) [he] was not arrested after the interview.

[Doc. 59 at 8-9].  On the other hand, Dixon argues that he was in custody at the time of the interview as a reasonable person would not have felt free to leave under the circumstances since "he was surrounded by at least 12 law enforcement officers, including some agents searching his home and officers with marked police cars lining the perimeter of the small yard"; he "was prevented from re-entering his home, and kept outside in the early morning hours"; he "was interviewed by two federal agents, one of whom was armed"; and "one of the agents physically grabbed his cell phone from his hand," which was "a controlling, threatening, and aggressive act."  [Doc. 63 at 3-4].

A defendant is in custody under <u>Miranda</u> when there has been a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation

omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).  However, "[a]n interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." Matcovich, 522 F. App'x at 851 (quoting United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam)); see also United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (per curiam) (citation omitted) (quoting Minnesota v. Murphy, 465 U.S. 420, 431 (1984)) ("'[T]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]'").  Instead, whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." Barry, 479 F. App'x at 299 (quoting Brown, 441 F.3d at 1347).  This test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer[s] on whether the defendant was free to leave are irrelevant." Brown, 441 F.3d at 1347 (citation and internal marks omitted).  Thus, "[t]he 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he . . . was not at liberty

to terminate the interrogation and leave.'" <u>Matcovich</u>, 522 F. App'x at 851 (quoting

<u>Howes v. Fields</u>, 565 U.S. 499, 509 (2012)).  "[T]he reasonable person from whose

perspective 'custody' is defined is a reasonable innocent person." <u>United States v.</u>

<u>Street</u>, 472 F.3d 1298, 1309 (11th Cir. 2006) (internal marks omitted) (quoting

<u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996)).

The Court must "consider several factors in determining custody, 'including

whether the officers brandished weapons, touched the suspect, or used language

or a tone that indicated that compliance with the officers could be compelled.'"

<u>Barry</u>, 479 F. App'x at 299 (quoting <u>Street</u>, 472 F.3d at 1309).  Other factors include

"the location and length of the detention," <u>United States v. Luna-Encinas</u>, 603 F.3d

876, 881 (11th Cir. 2010) (citations omitted), as well as "statements made during

the interview, the presence of physical restraints during questioning, and 'the

release of the interviewee at the end of the questioning,'" <u>Matcovich</u>, 522 F. App'x

at 851 (quoting <u>Howes</u>, 132 S. Ct. at 1189).

"Considering the totality of the circumstances, the factors weigh in favor of

finding [Dixon's] interrogation non-custodial." <u>Id.</u> at 851-52.  On April 18, 2017,

Dixon "was interviewed in familiar surroundings outside his own home," at a

table in the front yard of the property. <u>United States v. Rogers</u>, Criminal Action

No. 1:09-CR-544-TWT-ECS, 2010 WL 2721883, at *2 (N.D. Ga. June 9, 2010),

adopted by 2010 WL 2697084, at *1 (N.D. Ga. July 7, 2010); see also United States v. Young, CRIMINAL CASE NO. 3:16-cr-00006-TCB-RGV, 2017 WL 653556, at *3 (N.D. GA. Jan. 25, 2017), adopted by 2017 WL 635120, at *1 (N.D. Ga. Feb. 16, 2017) (citation and internal marks omitted) ("[A]lthough not dispositive, courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."); (Tr. at 5). At the outset, the agents told Dixon that he was not under arrest and that he did not have to submit to questioning.  (Tr. at 6; Gov. Ex. 1 at 0:29-0:55); see also Young, 2017 WL 653556, at *3 (alterations in original) (citation and internal marks omitted) (explaining that courts should "consider whether a suspect was unambiguously advis[ed] . . . that he is free to leave and is not in custody" as this is a "powerful factor that generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview").  Dixon was not physically restrained during the interview.  (Tr. at 7).  Neither of the agents brandished their weapons at any point, and their weapons remained out of sight throughout the interview.  (Tr. at 7, 12).  The interview concluded after approximately 45 minutes, and Dixon was not arrested that day.  (Tr. at 9; Gov. Ex. 1).

Dixon relies on the fact that "one of the agents physically grabbed his cell phone from his hand," which he asserts was a "controlling, threatening, and aggressive act." [Doc. 63 at 3]. Although it is true that TFO Nicholson grabbed the iPhone from Dixon's hands, (Tr. at 8, 17), this was only after Dixon had picked up the iPhone and stated that he needed to "do some stuff" before letting the agents look through it, (Tr. at 8; Gov. Ex. 1 at 14:44-14:56), which prompted TFO Nicholson to respond quickly to retrieve the iPhone and prevent the possible destruction of evidence, (Tr. at 8), as the iPhone was included among the items identified for seizure in the search warrant, (Gov. Ex. 1 at 14:56-15:28); see also [Doc. 58-1 at 2, 4]. Moreover, during this exchange, the agents maintained a calm tone, see (Gov. Ex. 14:20-16:50), as they had throughout the entire interview, see (Gov. Ex. 1).[19] Accordingly, even if these facts "suggest the interview was custodial," they do not, standing alone, "render this a custodial interrogation when: (1) [Dixon] was unambiguously told he was free to leave, was not in custody, and did not have to answer questions"; (2) he was in a familiar setting in the front yard of his home; "(3) he was not physically restrained during questioning"; "(4) the agents' weapons were holstered when they spoke with

---

[19] Similarly, Dixon's demeanor throughout the interview was friendly, aside from some minor agitation during the exchange regarding his iPhone. (Tr. at 7-9); see also (Gov. Ex. 1).

[him]"; and (5) "after the interview was over, [he] left voluntarily [to wait for his ride to school] and was not arrested until a later time." Matcovich, 522 F. App'x at 852 (citations and internal marks omitted); see also Brown, 441 F.3d at 1349 ("No particular fact in the 'custody' analysis is outcome determinative—[the Court] simply weigh[s] the totality of the circumstances."); (Tr. at 5-7, 9, 12).

"In sum, because [Dixon] was not subject to custodial interrogation when the agents spoke with him [outside] his home on [April 18, 2017], Miranda warnings were not required," and since the "statements were not obtained in violation of Miranda, [] they are not due to be suppressed on that basis." Young, 2017 WL 653556, at *5 (citations omitted); see also id. at *4-5 (citations omitted) (concluding that the defendant was not subject to a custodial interrogation where he was interviewed outside his home, told he was not under arrest and that he did not need to speak with the agents, he was not handcuffed or restrained in any way, the agents spoke in a calm tone of voice and made no promises or threats, the agents' weapons were holstered throughout the interview, the interview was brief in duration, and at the conclusion of the interview, the defendant was led back to his family and was not arrested until eight months later); cf. Rogers, 2010 WL 2721883, at *2 (finding the defendant "was not in custody for purposes of Miranda" and thus "Miranda warnings were not required" where there "was no restraint on

[his] freedom of movement of a degree associated with formal arrest," he was told "he was not under arrest and was free to leave," he "was not handcuffed or under any other restrained when he was interviewed," no "weapons were pointed at [him] or even un-holstered at the time," and he "was interviewed in familiar surroundings outside his own home").

### 2.    Voluntariness Claim

Although Dixon's statements were not taken in violation of <u>Miranda</u>, "the [C]ourt still must determine that any confessions or incriminatory statements made by [Dixon] were voluntary in order to admit them at trial." <u>United States v. Lazarus</u>, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing <u>United States v. Bernal–Benitez</u>, 594 F.3d 1303, 1317–18 (11th Cir. 2010)).  Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.   <u>United States v. Shepherd</u>, Criminal Case No. 1:11–cr–00058– ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252 (11th Cir. 2003)).  "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" <u>United States v. Villaverde-Leyva</u>, Criminal Action File No. 1:10-CR-035-

RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police."  Id. (citations omitted).

The focus of the voluntariness inquiry is whether Dixon was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345 (citation omitted).  Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'"  United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)); see also Connelly, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'"); Demarest v. Sec'y, Dep't of Corr., Case No. 8:13-cv-75-T-36TBM, 2016 WL 951913, at *6 (M.D. Fla. Mar. 14, 2016) (citation omitted).  "Sufficiently coercive conduct normally involves subjecting the accused to an

exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." Jones, 32 F.3d at 1517 (citation omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985), modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per curiam) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

Dixon moves to suppress his statements on the ground that they were involuntary. [Doc. 37 at 2; Doc. 63 at 4-6]. Specifically, he asserts that "the circumstances of the interview were coercive," as his "home had been raided by at least 12 law enforcement officers early in the morning, and he was not allowed to re-enter the home"; the "perimeter was surrounded by marked police cars with lights on"; he was interviewed by two agents and "another law enforcement officer was nearby, such that he was outnumbered"; the agents "were aware of his educational level—that he had not completed high school—because he stated that he was in school trying to obtain his [GED]"; "although the agents did not make any explicit threats against [him], TFO Nicholson physically grabbed the cell phone from his hands, and the third law enforcement officer intervened at the

same time"; and he "was subject to physical intimidation," as the agents "had nearby back up, enhancing their threatening presence."  [Doc. 63 at 5-6].  By contrast, the government points out that Dixon "agreed to be interviewed by the agents," he "was not threatened or coerced to speak with the agents and was told that he did not have to answer any of their questions," he was "coherent and did not appear to be under the influence of drugs or alcohol," he "understood the agents' questions and there was no language barrier," he was "not handcuffed or physically restrained," no weapons were drawn on him, the interview "only lasted approximately forty-five minutes," and "when asked for the passcode to his phone, [Dixon] refused to give it to the agents, evidencing he understood he had a choice in the matter."  [Doc. 59 at 13-14 (citations omitted)].

"A confession is involuntary if the suspect's 'will was overborne in such a way as to render his confession the product of coercion.'"  Demarest, 2016 WL 951913, at *6 (quoting Arizona v. Fulminante, 499 U.S. 279, 288 (1991)); see also United States v. Pinder, CRIMINAL ACTION FILE NO. 1:08-CR-421-03-MHS/AJB, 2009 WL 10670633, at *30 (N.D. Ga. Dec. 23, 2009), adopted by 2010 WL 11507903, at *14 (N.D. Ga. Mar. 6, 2010), aff'd, 437 F. App'x 816 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted) ("Determining if a confession is voluntary requires examining whether a defendant's will was

overborne by the circumstances surrounding the giving of a confession.").  As previously noted, the Court must consider the totality of the circumstances, including the location of the interview, to determine whether Dixon's statements were voluntary.  <u>Pinder</u>, 2009 WL 10670633, at *30 (citations omitted); <u>see also</u> <u>Bernal-Benitez</u>, 594 F.3d at 1319 (citation omitted) ("[The Court] consider[s] the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when deciding whether a confession was voluntary.").

"Considering the totality of the circumstances as established by the evidence adduced at the evidentiary hearing, the Court finds that the government has demonstrated by a preponderance of the evidence that [Dixon's] statements were entirely voluntary."  <u>United States v. Lynn</u>, 547 F. Supp. 2d 1307, 1311 (S.D. Ga. 2008), adopted at 1308 (citations omitted).  The interview, which lasted only forty-five minutes, <u>see</u> (Gov. Ex. 1), was not unreasonably long, <u>see</u> <u>Shriner v. Wainwright</u>, 715 F.2d 1452, 1455 (11th Cir. 1983) (concluding that statements made during a five hour interrogation were not involuntary); <u>Pinder</u>, 2009 WL 10670633, at *31 (citation omitted) (finding that two hours and twenty minutes of interrogation was not coercive).  Additionally, the agents maintained a calm and conversational tone throughout the interview, did not brandish their weapons, and did not use any physical force against Dixon, aside from the brief encounter

42

in which TFO Nicholson took the iPhone from Dixon's hands in an effort to prevent the possible destruction of evidence, but as previously noted, even during this exchange, the agents maintained a calm demeanor. See (Tr. at 7-8, 12, 17-18; Gov. Ex. 1); see also Moran, 475 U.S. at 421 (citation omitted) ("[T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."); Miller, 838 F.2d at 1537 (finding that "there was no official overreaching that could have rendered [defendant's] statement involuntary" under the totality of the circumstances, including that "[t]he transcript [did] not suggest, nor d[id] [defendant] allege, that the police either applied physical force or threatened to do so").  Dixon was advised at the beginning of the interview that he was not under arrest and that he did not have to answer any questions, (Tr. at 6; Gov. Ex. 1 at 0:29-0:55), and he was subsequently repeatedly advised that he did not have to give the agents the passcode for the iPhone, and he ultimately exercised his right to not provide that information, see (Gov. Ex. 1 at 14:05-16:20, 37:50-44:13); see also United States v. Chan, CRIMINAL ACTION FILE NO. 1:14-CR-203-ODE-AJB, 2015 WL 13736217, at *8 (N.D. Ga. Nov. 17, 2015), adopted by 2016 WL 627350, at *4 (N.D. Ga. Feb. 16, 2016) (concluding that defendant's statements were voluntarily given where he "was told that he was not under arrest and that he was free to leave," and he "chose not to answer

several questions, and refused to give his identification or consent to the search of the vehicle, demonstrating that the atmosphere and the questioning did not inhibit [his] ability to exercise free choice").

Moreover, there is no evidence that Dixon's statements were induced by any promises made by the agents, see United States v. Mercer, 541 F.3d 1070, 1075 (11th Cir. 2008) (per curiam) (footnote omitted) ("[N]othing in the record evidences that anyone made promises to [d]efendant, direct or implied, in exchange for his statements."); United States v. La Forgia, Criminal No. 12–0057–WS–C, 2012 WL 1869035, at *4 (S.D. Ala. May 22, 2012) ("Simply put, there is no evidence of the kinds of affirmative misrepresentations that might render [defendant's] statements involuntary and require their suppression."), and while the agents were aware of his limited education, as he stated he was pursuing his GED, (Tr. at 9; Gov. Ex. 1 at 2:13-2:27), there is no evidence he had any difficulty understanding the agents' questions or that this affected the voluntariness of his statements, see United States v. Garcia, CR 16-00478-17-TUC-JGZ(LAB), 2017 WL 4325591, at *1, 5 (D. Ariz. Sept. 8, 2017), adopted by 2017 WL 4284604, at *1 (D. Ariz. Sept. 27, 2017) (finding the defendant's statements were voluntary based on the totality of the circumstances even though he "was only 19 years old, did not graduate from high school, had no prior contact with law enforcement, and was not advised of his

*Miranda* rights"). Thus, the statements Dixon made on April 18, 2017, were voluntary and are not due to be suppressed, and it is **RECOMMENDED** that his motion to suppress statements, [Doc. 37], be **DENIED**.

### III. CONCLUSION

For the foregoing reasons, the government's motion for leave to file a sur-reply, [Doc. 65], is **GRANTED**, and it is **RECOMMENDED** that Dixon's motion to suppress evidence, [Doc. 36], motion to suppress statements, [Doc. 37], motion for return of property, [Doc. 38], and amended motion for return of property, [Doc. 41], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 15th day of April, 2021.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE